

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0149-23

---

### THE STATE OF TEXAS

v.

### IVAN GABALDON, Appellee

---

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE EIGHTH COURT OF APPEALS
### EL PASO COUNTY

---

RICHARDSON, J., delivered the opinion of the Court in which NEWELL, WALKER, MCCLURe, and PARKER, J.J., joined. SCHENK, P.J., filed a concurring opinion. YEARY, J., concurred. FINLEY, J., filed a dissenting opinion in which KEEL, J., joined.

## OPINION

Appellee was initially indicted for murder. After he sought dismissal on speedy trial grounds the State dismissed the murder charge and reindicted Appellee for capital murder with the intent to seek the death penalty. The trial court, after finding that the State's

reindictment was unconstitutionally vindictive, dismissed the case with prejudice. The El Paso 8th Court of Appeals agreed and affirmed the trial court. The question before this Court is whether the trial court abused its discretion in doing so. We hold that the trial court did abuse its discretion and reform the trial court's order to remove the "with prejudice" language from its dismissal. In doing so, as urged by the State, we allow them to reindict Appellant but limited to the original charge of murder or any other lesser-included offense per its discretion.

**BACKGROUND**

On February 27, 2021, Appellee Ivan Gabaldon was detained by the El Paso Police Department in the course of a murder investigation following the discovery of the body of Juan Garcia Flores. (1 CR 209-10). According to the complaint affidavit which was filed the next day (February 28), Flores's body had been discovered in a small bathroom following a call to police for a welfare check in the morning hours of February 23, 2021. (1 CR 209-10). Police believed he had died on February 22 after suffering multiple stab wounds to his back and neck. The complaint affidavit identified Appellee as the alleged perpetrator of the stabbing and further alleged that the stabbing happened because of a disagreement while Appellee was receiving oral sex in exchange for money in Flores's truck.

In the complaint affidavit, Appellee claimed that Flores pulled a knife and threatened Appellee while stating a desire to perform other sexual acts on Appellee against Appellee's wishes. (1 CR 209-10). Appellee claimed that he then appropriated and drove

2

Flores's truck away after he threw the knife out onto an unknown street. (1 CR 209-10). According to the affidavit allegations, Appellee then sold the stolen truck for $200, changed his clothes, and then fled to Juarez, Mexico. (1 CR 209-10). A warrant for Appellee's arrest was signed on the same day as the complaint affidavit and executed on the February 28th. (1 CR 208).

On March 5, 2021, Appellee, his counsel, and the State appeared before a magistrate for a bond hearing after his original bond was set for $1 million. (2 RR 1; 1 CR 212). There, Appellee requested that his bond be reduced to a more reasonable amount and be given a personal recognizance bond with strict reporting conditions. (2 RR 4-6). In support, Appellee's trial counsel represented that Appellee was a natural citizen who worked in downtown El Paso to support his pregnant wife and child living in Juarez, Mexico. Trial counsel also argued that the bond amount should be lowered because Appellee had a strong self-defense claim.

The State opposed bond reduction and stated the following:

> Judge, we don't believe that the defendant is even a U.S. citizen, and I think that this claim that he was born in Chicago is false. We know that he is crossing the border on a very regular basis during the week using a false Social Security card.

(2 RR 6). The State further alleged that the birth certificate was fake and that Appellee had no real ties to the community. (2 RR 6-7). According to the State, Appellee was also a danger to the community because Appellee was arrested and was on bond for two pending fourth degree felony charges, Possession of Stolen Vehicles (1st Offense) and Non-

3

residential Burglary, in New Mexico allegedly committed only 12 days prior to the alleged murder. (2 RR 6-7; 1 CR 42 ("Notice of Extraneous Offenses" alleging Appellee had pending felonies from Dona Ana County, New Mexico)). After the State highlighted Appellee's alleged efforts to hide evidence in the instant case and flee to Juarez, the magistrate denied Appellee's request and continued the bond at $1 million. (2 RR 9).

### *First Indictment*

On March 10, 2021, the Grand Jury returned an indictment against Appellee for a single count of Murder under trial court cause number 20210D00530 and assigned to the 210th District Court for El Paso. (1 CR 9). On March 17, Appellee filed a formal request for all discovery pursuant to Texas Code of Criminal Procedure Article 39.14. (1 CR 214).

On May 18, at the judge's conference, the court coordinator mentioned on the record that trial was set for November 5, 2021. (3 RR 4). Another status conference was held on August 19. (4 RR 1). There the State announced that it had no plea recommendations yet. Defense, in response, responded "I think we're just going to wait for our trial date . . . ." (4 RR 4).

On October 5, 2021, a month before trial, the trial court held a hearing on Appellee's motion to inspect the evidence. There, Appellee complained that the State still hadn't turned over required discovery including Appellee's own statements made to the police. (5 RR 4-16). In spite of the missing discovery, Appellee announced that he was ready for trial on November 5. Appellee's counsel also announced Appellee's opposition to any

continuance or that Appellee be released under a personal recognizance bond. The State said that it was sending evidence to DPS labs for forensic testing and promised that the missing statement would be given to Appellee via their digital discovery portal. The trial judge, while noting the State's tardiness in this case and other serious cases, acknowledged that there was no jury panel available on November 5 due to COVID-19 protocols. (5 RR 10-14). The trial court then reset the trial to December 2, 2021 and announced another hearing in two days (October 7) to receive updates on the State's progress. (5 RR 15).

On October 7, the trial court reconvened to receive updates. After dealing with additional discovery matters including items of evidence recently submitted by the State for DNA testing, the trial court proclaimed that it would still go forward with trial on December 2 with two jury panels. (6 RR 14). The trial court also granted Appellee's motion for discovery and inspection of evidence and set October 19 as the date to reconvene. Nevertheless, Appellee's counsel once again, despite having complained about discovery issues, declared the defense ready for trial on December 2.

On Novermber 15, 2021, the State filed a motion for a continuance of the December 2 trial date. In support, the State provided three reasons:

(1) The lead prosecutor, Curtis Cox, had jury duty set for December 3, 2021—the day after jury trial was to commence.
(2) DNA testing on 10 items submitted to DPS had not yet been completed.
(3) Three material witnesses, including one that may have had exculpatory information, could not be located.

(1 CR 264-65). Appellee's counsel responded with a motion objecting to the continuance and requesting a speedy trial dismissal. (1 CR 269). A hearing was held on November 16, to address these motions and a contemporaneous State's motion objecting to masked jurors during jury selection. During the hearing and in addition to the three arguments above, Curtis Cox, on behalf of the State, also claimed that he intended to take the case to be reindicted under the capital-murder statute and needed time to evaluate the case. (8 RR 16).

At the hearing, Appellee's trial counsel, in response, opposed the continuance and asserted that the State's need for a continuance was of its own making after failing to exercise due diligence in locating witnesses and testing evidence. Appellee's counsel once again announced its readiness for trial—even on a capital-murder reindictment—and declared it would be willing to waive its 10 days to prepare for it. (8 RR 17-22).

### *Second Indictment and State's Motion to Seek the Death Penalty*

On November 17, 2021, the State motioned the trial court to dismiss Appellee's murder charge without prejudice which the court granted. At the same time, the State reindicted the case under the capital-murder statute to be tried in the 210th District Court (Cause number 20210D02909). (1 CR 8). On November 18, the State renewed their November 15 request for a continuance in an amended motion. In their amended motion, the State added a fourth reason that the State needed time to evaluate whether to pursue the death penalty.

Subsequently, "State's Notice of Intent to Seek the Death Penalty" was filed on November 22.

***Defense Motion to Dismiss on Prosecutorial Vindictiveness***

On November 23, 2021, Appellee filed his "Motion to Dismiss Based on Prosecutorial Vindictiveness." (1 CR 76). In the motion, Appellee claimed that the State elected to seek the death penalty as "retribution for [Appellee] asserting his speedy trial rights" and as a means of delaying the trial. (1 CR 78). In support, Appellee argued that the State's justifications for seeking the death penalty were contradicted by other contemporaneous actions such as offering a PR bond. Notably, Appellee alleged that they were implicitly threatened during the November 16 hearing where the following exchange happened on the record:

| | |
|---|---|
| Defense: | But, you know, we're in a situation where weeks before trial now we're – you know, now we're looking at a capital murder. And my thought is this is just a way to delay. We are ready and if they indict, Your Honor, we are willing to waive our ten days. |
| The Court: | Okay. All right. |
| Defense: | May I say – |
| Prosecutor: | I do not think you can do that while we consider whether to seek the death penalty. However, I will seek the death penalty if that's what becomes necessary. |
| Defense: | We'll still waive our ten days. |

(8 RR 17).

The State countered in a written response that it had reindicted the case under the capital-murder statute because of the horrific aggravating facts of the case. The State alleged that Appellee had committed a murder motivated by hate in the course of

7

committing a premeditated robbery. Per the State, the victim had been stabbed approximately 20 times while on his knees and had been targeted because of his sexual orientation. The State asserted that it was essentially correcting the misjudgment of prior prosecutors who undercharged the alleged offense. (1 CR 111). With regard to the State's proposal to release Appellee on a personal recognizance bond, the State asserted that while Appellee was a continuing danger to society, he had "the presence of mind necessary to conform his behavior while being watched by the criminal justice system." (1 CR 113).

### Trial Court's Hearing on Vindictiveness

On November 29, the trial court held a hearing and heard arguments regarding a number of pretrial matters including Appellee's motion to dismiss. While both parties re-urged arguments from their written motion, the State also announced that it was now ready for trial on December 2. (10 RR 66). Nevertheless, at the end of the hearing, the trial court, in light of the late developments, delayed trial tentatively to January 14, 2022 on its own motion. (10 RR 105).

On December 14, 2021, the trial court orally informed the parties in a hearing that it was granting Appellee's motion to dismiss.

Trial Court: There are several points that the Defense has brought up or highlighted, but clearly I saw the proceedings transpire as they did. I simply find the State's reasoning and explanations for its decision to reindict and ultimately seek the death penalty as not credible.

I am therefore granting the Defense Motion to Dismiss for Prosecutorial Vindictiveness.

8

I am very concerned. I am very concerned and have been concerned for a while because of the lack of diligence that the State of Texas has, the manner in which they've been handling –you-all have been handling these cases. It is with no pleasure whatsoever that I am looking at this case and just feeling, in my years as a prosecutor and being in this courthouse, I certainly did not expect to be in a position to see the State of Texas literally disregard some of the most serious cases, to include this one, but as I know that there are others.

\*\*\*

There are families of victims that are not being well served when cases within the DA's office can just be disregarded. And there are so many troubling things, I agree. I'm not going to reiterate. But I do feel that the Defense has provided sufficient evidence that the reindictment and the decision to seek the death penalty was an unjustifiable penalty resulting solely from [Appellee] exercising his right to go to trial.[1]

---

[1] We note that Yvonne Rosales, the District Attorney for the 34th Judicial District during the pendency of this case, submitted her resignation letter to be effective on December 14, 2022. *Resignation Letter from Dist. Attorney Yvonne Rosales to Gov. Greg Abbott* (Nov. 28, 2022). At the time, Rosales was facing a petition to remove her from office after allegations were made of official misconduct and widespread incompetence during her administration. *State of Texas ex rel. Omar Carmona v. Yvonne Rosales*, No. 2022DCV2472 (346th Dist. Ct. Aug. 24, 2022). In addition to the alleged prosecutorial vindictiveness in the instant case, the allegations of incompetence included the dismissal of hundreds (with thousands more expected) of criminal cases by the jail magistrate for District Attorney Rosales's failure to secure an indictment or information. *Id.* at \*3-4. Also included in the allegations were her alleged mishandling of the mass murder case, *State v. Patrick Wood Crusius*, Nos. 2019D004878 & 20200D02631. *Id.*; *see also In re State*, 705 S.W.3d 443 (Tex. App.—El Paso 2024) (discussing the alleged facts of *Crusius* and the State's alleged violation of the trial court's explicit orders during that case). Per the petition to remove, District Attorney Rosales's office had failed to file a single pleading in eighteen months while overseeing the case. Simultaneously, she also promised to hire new prosecutors to oversee *Crusius* and take it to trial in less than a year. *Ex rel. Carmona*, No. 2022DCV2472, at \*3. District Attorney Rosales's resignation became effective the day prior to a hearing set for December 15, 2022, which would have decided whether she should be temporarily suspended from office and another appointed in her place pending trial. *See* Order Setting Hearing on Temp. Suspension of the Respondent/Defendant Pending Trial, *Ex rel. Carmona*, No. 2022DCV2472.

More than one administration has occupied the District Attorney's office since former-D.A. Rosales. Former-D.A. Bill D. Hicks was appointed by Governor Abbott, on December 14, 2022, to succeed Rosales and finish the remainder of her term. *Governor Abbott Appoints Hicks as 34th Judicial District Attorney*, OFFICE OF THE TEXAS GOVERNOR: GREG ABBOTT (Dec. 14, 2022), https://gov.texas.gov/news/post/governor-abbott-appoints-hicks-as-34th-judicial-district-attorney. He was succeeded by the current D.A. James Montoya beginning in 2025. *Elected District Attorneys Through the Years*, EL PASO COUNTY: DISTRICT ATTORNEY JAMES MONTOYA, https://www.epcounty.com/da/meet.htm (last visited May 22, 2025).

(11 RR 7-8). A written order dismissing the case with prejudice was entered that same day which the State appealed. (1 CR 173, 174-75).

At the Eighth Court of Appeals, the State argued that the dismissal was an abuse of the trial court's discretion and that the "with prejudice" portion was judicial overreach. The State asserted that there was no competent evidence to support the trial court's finding that the reindictment was motivated by prosecutorial vindictiveness. According to the State, Appellee's speedy trial right was not asserted until after the State notified them of their intent to reindict the case. The State further asserted that it had not yet received evidence concerning the robbery of the truck (necessary to invoke the capital-murder statute) until well after the original murder indictment as further justification for the late reindictment. Per the State, the receipt of the "new evidence" irrefutably rebutted any support for the trial court's factual findings. Thus, the State concluded that the trial court's findings were effectively unsupported and must be reviewed de novo. Alternatively, the State argued that dismissal with prejudice was unwarranted and that the State should be allowed to prosecute the case as a non-capital murder or another lesser-included offense.

The Eighth Court of Appeals, however, deferred to the trial judge's credibility findings and found evidence of actual vindictiveness on the part of the State. "The State reindicted [Appellee] for capital murder as punishment for his opposition to their requests for a continuance." *State v. Gabaldon*, 661 S.W.3d 558, 568 (Tex. App.—El Paso 2023). Thus, the lower appellate court found no abuse of discretion from the trial court. And because the Eighth Court of Appeals opined that there was no other way to "neutralize the

taint of the State's egregious conduct in this case," they affirmed the dismissal of the indictment with prejudice. *Id*.

On discretionary review, the State continues its position that dismissing with prejudice is unwarranted even if there was a constitutional violation. Moreover, the State does not concede that prosecutorial vindictiveness was the reason for re-charging Appellee with capital murder and pursuing the death penalty.[2] The State contends the mere dismissal of the capital murder charge (but without prejudice) would have cured any perceived taint of unconstitutionality. Thus, the State argues that the trial court unnecessarily invaded the exclusive province of the State's prosecutorial discretion in forcing a dismissal with prejudice. And in doing so, the State urges this Court to allow the reindictment of Gabaldon but limited to the offense of murder or any other lesser-included offense.

**APPLICABLE LAW**

"[T]here is no general authority, written or unwritten, inherent or implied, which would permit a trial court to dismiss a case without the prosecutor's consent." *State v. Johnson*, 821 S.W.2d 609, 613 (Tex. Crim. App. 1991); *see also State v. Dinur*, 383 S.W.3d 695, 699 (Tex. Crim. App. 2012). This includes dismissals *without* prejudice and dismissals *with* prejudice. *Ex parte Seidel*, 39 S.W.3d 221, 224 (Tex. Crim. App. 2001); *State v. Plambeck*, 182 S.W.3d 365 368 (Tex. Crim. App. 2005). Even under its inherent

---

[2] "If there was prosecutorial vindictiveness in this case, which the State does not concede, the dismissal of the capital-murder indictment cured any constitutional violation." St. Br. at *8. "While not agreeing with the trial court or the Court of Appeals on the finding and holding of prosecutorial vindictiveness in this case, . . . what the State contests is that any taint in the capital-murder indictment occasioned by prosecutorial vindictiveness did not ever extend to the original murder indictment, . . . ." St. Br. at *11-12.

11

judicial authority, trial courts lack this power because "dismissal of a case does not serve to 'enable our courts to effectively perform their judicial functions and to protect their dignity, independence, and integrity.'" *Johnson*, 821 S.W.2d at 613 (quoting *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398 (Tex. 1979)).

A trial court only gains the authority to dismiss (over the State's opposition) when it is "authorized by constitution, statute, or common law." *State v. Mungia*, 119 S.W.3d 814, 816 (Tex. Crim. App. 2003). Our case law recognizes a trial court's authority to dismiss a case without the prosecutor's consent in the following situations:

> (1) where a defendant has been denied a right to a speedy trial;
> (2) where there is a defect in the charging instrument;
> (3) where a defendant is detained and no charging instrument is presented (in violation of Texas Code of Criminal Procedure Article 32.01); and
> (4) to remedy certain Sixth Amendment violations to the right to counsel— where the "defendant suffers demonstrable prejudice, or a substantial threat thereof, and where the trial court is unable to identify and neutralize the taint by other means."

*Dinur*, 383 S.W.3d at 700; *Johnson*, 821 S.W.2d at 612; *State v. Frye*, 897 S.W.2d 324, 330 (Tex. Crim. App. 1995). Moreover, "other constitutional violations not yet identified may also support a trial court's dismissal of a case." *Dinur*, 383 S.W.3d at 700.

Nevertheless, dismissing a case, especially with prejudice, is "a drastic measure only to be used in the most extraordinary circumstances." *Mungia*, 119 S.W.3d at 817 (quoting *Frye*, 897 S.W.2d at 330). Generally, the scope of a judicial remedy should be narrowly tailored to cure the harmful conduct without "unnecessarily infringing on competing interest." *United States v. Morrison*, 449 U.S. 361, 364, 365 (1981). Dismissal

12

with prejudice is only warranted when there is no other means to nullify the violative act. *See id*. at 365-66. "Therefore, where there is no constitutional violation, or [defendant's] rights were violated but dismissal of the indictment was not necessary to neutralize the taint of the unconstitutional action, the trial court abuses its discretion in dismissing the charging instrument without the consent of the State." *Dinur*, 383 S.W.3d at 700 (citing *State v. Terrazas*, 962 S.W.2d 38, 42 (Tex. Crim. App. 2003)).

To answer whether the trial court's dismissal with prejudice was an abuse of discretion, we first look to see if there is evidence supporting prosecutorial vindictiveness in the record. There was. Both the trial court and the court of appeals agree the State's actions were vindictive, and the record supports that finding. As a result, we must next answer the question of whether the finality of dismissing with prejudice was necessary to "neutralize the taint" of the State misconduct. In this case, Appellee alleges that he was vindictively reindicted for capital murder where the State pursued the death penalty because Appellee asserted his right to a speedy trial. Thus, based on the above facts and assumptions, "neutralizing the taint" requires the Court to question what would have happened to the State's case had the alleged misconduct never happened. If a neutralized condition can be achieved with reasonable ease, then this Court should take such steps to achieve it. However, if it is impossible to remove the poison from the State's case, only then does this Court have the authority of employing the "drastic remedy" of dismissing with prejudice.

The "decision whether or not to prosecute, and what charges to file" generally rests in the discretion of the prosecutor "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Thus, "[a]n initial indictment—from which the prosecutor embarks on a course of plea negotiation—does not necessarily define the extent of the legitimate interest in prosecution." *United States v. Goodwin*, 457 U.S. 368, 380 (1982).

Nevertheless, the Due Process Clause is violated when criminal charges are brought in retaliation for the defendant's exercise of his legal rights. *Neal v. State*, 150 S.W.3d 169, 173 (Tex. Crim. App. 2004).

> To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is patently unconstitutional.

*Bordenkircher*, 434 U.S. at 363.

On appellate review, we "afford almost total deference to a trial court's determination of the historical facts that the record supports."[3] *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We similarly afford the same deference to "trial court rulings on application of law to fact questions" if the resolution turns on evaluations

---

[3] There is no noticeable difference between the proposed "clearly erroneous" standard and the *Guzman* standard applied to the trial judge's findings. Under the clearly erroneous standard, the reviewing court pays great deference to the trial court's findings unless "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364m 395 (1948). Although we utilize different nomenclature, that is exactly what we are doing here.

14

of credibility and demeanor. *Id*. However, we review de novo "mixed questions of law and fact" not depending on such evaluations of credibility and demeanor. *Id*.

### Speedy Trial

The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." The constitutional guarantee is that "the Government will move with the dispatch that is appropriate to assure him [the accused] an early and proper disposition of the charges against him. '[T]he essential ingredient is orderly expedition and not mere speed.'" *United States. v. Marion*, 404 U.S. 307, 313 (1971) (quoting *Smith v. United States*, 360 U.S. 1, 10 (1959). "The constitutional right is that of a speedy trial, not a dismissal of the charges." *Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008) (describing dismissal of the charges on speedy trial grounds as a "radical remedy"); *United States v. Loud Hawk*, 474 U.S. 302, 314 (1986) ("unsatisfactorily severe remedy of dismissal"). "It does not preclude the rights of public justice." *Beavers v. Haubert*, 198 U.S. 77, 87 (1905).

Per its own text, "the protection of the Amendment is activated only when a criminal prosecution has begun and extends only to persons who have been 'accused' in the course of that prosecution." *Marion*, 404 U.S. at 313. Therefore, "the Speedy Trial Clause of the Sixth Amendment does not apply to the period before a defendant is indicted, arrested, or otherwise officially accused." *United States v. MacDonald*, 456 U.S. 1, 6 (1982) (citing *Marion*, 404 U.S. at 313). "Thus, a person who has not yet been formally charged cannot

seek protection from the Speedy Trial Clause, and the State is not required 'to discover, investigate, and accuse a person within any particular period of time.'" [4] *Gonzales v. State*, 435 S.W.3d 801, 808 (Tex. Crim. App. 2014) (citing *Marion*, 404 U.S. at 313, 320) ("Rather, 'any delay between commission of the crime and indictment is controlled by the applicable statute of limitations.'").

"Dismissal of the charging instrument with prejudice is mandated *only* upon a finding that an accused's Sixth Amendment speedy-trial right was actually violated." *Cantu*, 253 S.W.3d at 281 (emphasis added). "This is a serious consequence because it means that a defendant who may be guilty of a serious crime will go free, without having been tried." *Barker v. Wingo*, 407 U.S. 514, 522 (1972). The trial court "must use a balancing test in which the conduct of the State and the defendant are weighed" in order to analyze such claims. *Shaw v. State*, 117 S.W.3d 883, 888 (Tex. Crim. App. 2003) (citing *Barker*, 407 U.S. at 530). Each case must be analyzed "with common sense and sensitivity

---

[4] As the Supreme Court has explained:

> The Sixth Amendment right to a speedy trial is thus not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.
> * * *
> But with no charges outstanding, personal liberty is certainly not impaired to the same degree as it is after arrest while charges are pending. . . Following dismissal of charges, any restraint on liberty, disruption of employment, strain on financial resources, and exposure to public obloquy, stress and anxiety is no greater than it is upon anyone openly subject to a criminal investigation.

*United States v. Macdonald*, 456 U.S. 1, 8–9 (1982).

16

to ensure that charges are dismissed *only when* the evidence shows that a *defendant's actual and asserted* interest in a speedy trial has been infringed."  *Cantu*, 253 S.W.3d at 281 (emphasis added) (citing *Barker*, 407 U.S. at 534–35 (rejecting defendant's claim that his speedy-trial right was violated despite a five-year delay where the record strongly indicated that the defendant did not actually want a speedy trial).  These factors, as defined under *Barker*, include:

> (1) the length of the delay;
>
> (2) the reason for the delay;
>
> (3) the defendant's assertion of his speedy trial right; and
>
> (4) the prejudice to the defendant resulting from the delay.[5]

*Barker*, 407 U.S. at 530; *Shaw v. State*, 117 S.W.3d 883, 888–89.  "No single factor is necessary or sufficient to establish a violation of the defendant's right to a speedy trial."  *Shaw*, 117 S.W.3d at 889.  "Rather, they are related factors and must be considered together with such other circumstances as may be relevant."  *Barker*, 407 U.S. at 533.  This is because a dismissal resulting from "a wooden application of the *Barker* factors would infringe upon 'the societal interest in trying people accused of crime.'"  *Cantu*, 253 S.W.3d at 281.

---

[5] Although the Texas Constitution independently guarantees an accused the right to a speedy trial, this Court has traditionally applied the same *Barker* analysis to determine a speedy trial claim under the Texas guarantee as well as the federal equivalent.  *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002).

*Length of Delay*

The length of delay, also called a "double inquiry," is the *prima facie* "triggering mechanism" that begins the *Barker* analysis. *State v. Munoz*, 991 S.W.2d 818, 821 (Tex. Crim. App. 1999). "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530. Presumptive prejudice "simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry." *Munoz*, 991 S.W.2d at 822 (quoting *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992)). "[A]n accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay . . . ." *Doggett*, 505 U.S. at 651. If the defendant makes this showing, the trial court must consider among other factors, "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Id.* Although every case should be examined under an *ad hoc* basis, "[i]n general, delay approaching one year is sufficient to trigger a speedy trial inquiry." *Doggett*, 505 U.S. at 652 n.1; *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003); *Shaw*, 117 S.W.3d at 889.[6]

---

[6] In *Harris v. State*, 827 S.W.2d 949 (Tex. Crim. App. 1992), this Court found that a thirteen-month delay was presumptively unreasonable and thereby sufficient to trigger the need for *Barker* analysis. The Court supported this finding by citing to LaFave & Israel, Criminal Procedure § 1832(b) (1984) with a parenthetical stating that some courts found eight months or longer as presumptively unreasonable. *See also Zamarano v. State*, 84 S.W.3d 643, 649 n. 26 (Tex. Crim. App. 2002) ("*See Harris v. State*, 827 S.W.2d at 956 (recognizing that courts generally hold that any delay of eight months or longer is presumptively unreasonable and triggers speedy trial analysis.).").

*Reason for Delay*

"In assessing the reasons for delay, a court must accord different weights to different reasons, and it must ask '*whether the government or the criminal defendant is more to blame for the delay*.'" *Hopper v. State*, 520 S.W.3d 915, 924 (Tex. Crim. App. 2017) (emphasis added) (quoting *Doggett*, 505 U.S. at 651–52). Deliberate attempts to delay trial to hamper the defense should be weighed against the government heavily. *Barker*, 407 U.S. at 531; *Munoz*, 991 S.W.2d at 822. "A more neutral reason such as negligence or overcrowded courts should be weighted less heavily." *Id*. "[A] valid reason, such as a missing witness, should serve to justify appropriate delay" and not be weighed against the government at all.[7] *Id*. "Delay caused by the defense weighs against the defendant."[8] *Hopper*, 520 S.W.3d at 924. Furthermore, "delay which is attributable in whole or in part to the defendant may even constitute a waiver of a speedy trial claim." *Munoz*, 991 S.W.2d at 822 (citing *Barker*, 407 U.S. at 529 (stating "delay attributable to the defendant" can waive speedy trial claims under the standard waiver doctrine)). This is especially the case in light of "the reality that defendants may have incentives to employ delay as a 'defense tactic': delay may 'work to the accused's advantage' because 'witnesses may become

---

[7] "Delay caused by good faith plea negotiations is not the result of negligence or a 'deliberate attempt to delay the trial.' We decide delay caused by good faith plea negotiations . . . should not be weighed against the prosecution." *State v. Munoz*, 991 S.W.2d 818, 824 (Tex. Crim. App. 1999); *see also Doggett v. United States*, 505 U.S. 647, 656 (1992) ("Our speedy trial standards recognize that pretrial delay is often both inevitable and wholly justifiable. The government may need time to collect witnesses against the accused, oppose his pretrial motions, or, if he goes into hiding, track him down.").

[8] This includes the actions of defense counsel because "each party is deemed bound by the acts of his lawyer-agent." *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 634 (1962)).

19

unavailable or their memories may fade' over time." *Vermont v. Brillon*, 556 U.S. 81, 90 (2009).

*Defendant's Assertion of his Speedy Trial Right*

"Whether and how a defendant asserts his right is closely related to the other factors . . . . The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences." *Barker*, 407 U.S. at 531. Although a defendant's failure to assert his speedy trial right does not amount to a waiver of that right, failure to assert the right . . . makes it difficult for a defendant to prove he was denied a speedy trial." *Dragoo*, 96 S.W.3d at 314. Moreover, "the longer the delay becomes, the more likely a defendant who wished a speedy trial would be to take some action to obtain it." *Id*. Therefore, "[t]his factor is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right to a speedy trial." *Gonzales v. State*, 435 S.W.3d 801, 810–11 (Tex. Crim. App. 2014). "This is so because a defendant's failure to make a timely demand for a speedy trial indicates strongly that he did not really want one and that he was not prejudiced by not having one." *Shaw v. State*, 117 S.W.3d 883, 890 (2003). Furthermore, "[f]iling for dismissal instead of a speedy trial will generally weaken a speedy-trial claim because it shows a desire to have no trial instead of a speedy one. If a defendant fails to first seek a speedy trial before seeking dismissal of the charges, he should provide cogent reasons for this failure." *Cantu*, 253 S.W.3d at 283; *see Barker*, 407 U.S. at 534–35 (finding that the defendant right to a speedy trial was not prejudiced

20

despite a five-year delay by the State because defendant's actions—including a motion to dismiss the indictment—showed that he did not want trial at all).

### *Prejudice to the Defendant*

In assessing whether there is prejudice to the defendant, the trial court must do so "in light of the interests of defendants which the speedy trial was designed to protect:"

(1) to prevent oppressive pretrial incarceration;

(2) to minimize the accused's anxiety and concern; and

(3) to limit the possibility that the accused's defense will be impaired.

*Dragoo*, 96 S.W.3d at 315 (citing *Barker*, 407 U.S. at 532). "[W]ith respect to the third interest, relating to the defendant's ability to defend himself, affirmative proof of prejudice is not essential to every speedy trial claim, because excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or even identify." *Shaw*, 117 S.W.3d at 890 (citing *Doggett*, 505 U.S. at 655). Nevertheless, the Supreme Court has recognized that "delay is a two-edged sword. . . . The passage of time may make it difficult or impossible for the Government to carry this burden [of proving its case beyond a reasonable doubt]." *Loud Hawk*, 474 U.S. at 315. Thus, "this presumption of prejudice to the defendant's ability to defend himself is 'extenuated . . . by the defendant's acquiescence' in the delay." *Dragoo*, 96 S.W.3d at 315; *Shaw*, 117 S.W.3d at 890 (both citing *Doggett*, 505 U.S. at 655).

"[I]n the absence of 'excessive' bad-faith or 'excessive' negligent delay by the government, a defendant usually has to show 'specific prejudice' to his defense." *Munoz*,

21

994 S.W.2d at 829 (citing *Doggett*, 505 U.S. at 655–57). "Although a showing of 'actual prejudice' is not required in Texas, the burden is on the accused to make some showing of prejudice which was the caused by the delay of his trial." *Harris v. State*, 489 S.W.2d 303, 308 (Tex. Crim. App. 1973) (citing *Courtney v. State*, 472 S.W.2d 151, 154 (Tex. Crim. App. 1971)). A finding of prejudice requires a showing that "lapses of memory" in witnesses "are in some way 'significant to the outcome' of the case." *Munoz*, 994 S.W.2d at 829 (quoting *Barker*, 407 U.S. at 534). A "bare assertion of 'dimming memories'" is insufficient. *Id*. To show prejudice via emotional distress, the Defendant is required to show "any anxiety or concern beyond the level normally associated with being charged" with the specific offense in question. *Shaw*, 117 S.W.3d at 890. In the case of missing witnesses, "the Appellee must show that the witnesses are unavailable, their testimony might be material and relevant to his case, and that he has exercised due diligence in his attempt to find them and produce them for trial. *Harris*, 489 S.W.2d at 308.

**ANALYSIS**

Here, we first note that the trial judge factually found the State prosecutor's justifications for the alleged retaliatory reindictment and pursuit of the death penalty as not credible. The record, to which the trial judge had first-hand knowledge, supports the trial judge's finding. For instance, the record documents late discovery disclosures by the State to which Appellee's attorney made repeated requests and complaints. The State also admitted to the trial judge that a prior prosecutor from among a string of prosecutors assigned to the case had, "for at least . . . six months, effectively did nothing." (8 RR 7). Another notable statement, moreover, was where the lead State prosecutor simultaneously

22

maintained that Appellee should be allowed to be placed on a personal recognizance bond while pursuing the death penalty for an extremely violent murder.

But perhaps most prominent is the timing of the State's reindictment conveniently right after Appellee asked the trial court for a speedy trial dismissal. The State asserted that reindictment was not sought to avoid a potential speedy trial dismissal. Instead, reindictment was justified only after the State discovered evidence of the aggravating robbery of Flores's truck and that the murder victim was a homosexual man. This eleventh-hour "discovery of new evidence" happened mere weeks before the December 2021 trial date and, per the State, gave rise to a possible hate crime. However, these claims are completely inconsistent with the complaint affidavit filed roughly nine months earlier. (1 CR 209-10). As noted above, the complaint affidavit attested that there was probable cause to believe that Appellee engaged in a homosexual act with Flores, stabbed him to death multiple times, and then stole his truck. The trial judge was not outside the zone of reasonableness in disbelieving that the State only became aware of these inculpatory details nine months after the State began its prosecution for murder. The trial judge also based this conclusion on her awareness of the State's mishandling of other cases in her court.

Thus, the trial judge's credibility finding is supported by evidence of actual vindictiveness in the record. And because Appellee has shown evidence showing actual vindictiveness, we conclude that the State, at least in part, retaliated against Appellee for exercising a legal right.

Next, we examine whether the trial court's authority to "neutralize the taint" necessitated dismissal with prejudice. To do so, we begin by looking at Appellee's assertion of his right to a speedy trial. We look to see if Appellee's speedy trial right was actually violated. If it was, then dismissal of the case with prejudice would have been the natural untainted result—and the trial court had the authority to effectuate that result. *Cantu*, 253 S.W.3d at 281. However, if Appellee's speedy trial right was not actually violated, then dismissal with prejudice would have been an abuse of discretion.

Here, we note that Appellee was publicly accused of Flores's murder on February 2, 2021. At the time of the State's misconduct, Appellee's trial was set for December 2, 2021. Thus, only around nine months would have passed had the case gone to trial. It is arguable that this amount of time is insufficient in a murder prosecution to trigger a *Barker* analysis. *Doggett*, 505 U.S. at 652 n.1 (stating that although cases are evaluated on an ad hoc basis, delays "approaching one year" may be sufficient to trigger *Barker* analysis). We note that there are a number of cases involving serious offenses that survived *Barker* analysis despite a delay measuring in years. Nevertheless, assuming *arguendo* that this time span is presumptively prejudicial enough to trigger *Barker*, there has been *de minimus* delay. We note that "the extent to which the delay stretches beyond the bare minimum needed" is near-zero. *Doggett*, 505 U.S. at 651. Thus, the length of the delay factor lends no weight in favor of Appellee.

The reasons for delay, likewise, offer little-to-no weight in support of a speedy trial dismissal. Although the State sought continuances multiple times, the trial court never

24

granted them. In other words, although they likely lacked diligence in pursuing the prosecution, the State never caused any delay. The only continuance ever issued by the trial court was when it reset the trial date of November 5 to December 2 because a jury panel was not available amidst the COVID-19 pandemic. Accordingly, in asking the question "*whether the government or the criminal defendant is more to blame for the delay*," we find the State blameless. *Hopper v. State*, 520 S.W.3d 915, 924 (Tex. Crim. App. 2017) (quoting *Doggett*, 505 U.S. at 651–52).

The third *Barker* factor, however, weighs against Appellee, though not heavily. We first note that Appellee, through counsel, timely asserted his right to a speedy trial. In a hearing on October 5, 2021, Appellee attorney, while complaining of missing discovery, orally announced that he was ready for trial and asked that any anticipated State requests for continuances be denied. (5 RR 8-9). Appellee's attorney maintained his oral demand for a speedy trial to take place on December 2 in subsequent hearings over the next month until November 15, 2021. (6 RR 21; 7 RR 7).

In response to the State's written motion for a continuance and *roughly two weeks before the December 2 trial date*, Appellee filed a written motion to dismiss with prejudice claiming a violation of his speedy trial right. (1 CR 269-71). And as noted earlier, "[f]iling for dismissal instead of a speedy trial will generally weaken a speedy-trial claim because it shows a desire to have no trial instead of a speedy one." *Cantu*, 253 S.W.3d at 283. Thus, when Appellee filed for a dismissal instead of a speedy trial prior to the trial date he initially

demanded, he contradicted his own demands for a speedy trial on December 2. He revealed a conflicting desire to avoid trial altogether.

Neither do the facts under the fourth *Barker* factor lean in Appellee's favor. We initially note that because we are assuming that the length of delay is barely past the point of triggering *Barker* analysis, Appellee must show more acute or egregious prejudice (created by the delay) than if the delay had been longer. *See Harris v. State*, 489 S.W.2d 303, 308 (Tex. Crim. App. 1973) (citing *Courtney v. State*, 472 S.W.2d 151, 154 (Tex. Crim. App. 1971)). In his motion to dismiss, Appellee claimed that he was suffering from oppressive pretrial incarceration because had been in prison since his February arrest. (1 CR 270). He additionally claimed that this had caused him "much anxiety and concern regarding the outcome of the trial." (1 CR 270). At a hearing dealing with Appellee's speedy trial motion and several other motions, Appellee's trial counsel also represented that the incarceration was causing economic hardship to Appellee's family in Mexico.[9] (8 RR 13). Neither his written motion nor his claim of economic hardship, however, offer "any anxiety or concern beyond the level normally associated with being charged" with murder. *Shaw v. State*, 117 S.W.3d 883, 890 (2003).

Furthermore, the record provides items, though not fully developed in the record, that undercut Appellee's claims of prejudice. We initially note that when Appellee was initially arrested, he had documented pending felony charges in New Mexico for which he

---

[9] We question whether Appellee's trial counsel's representations constitute competent evidence. Nevertheless, we will assume it is for the sake of argument.

was out on bail when the alleged murder of Flores occurred. (2 RR 6-7; 1 CR 42). The State also asserted in a "Notice of International Criminal Record" that Appellee had approximately six pending criminal cases in Chihuahua, Mexico ranging from dealing cocaine to assaultive offenses. (1 CR 170). Additionally, the State asserted at Appellee's initial bond hearing that Appellee was a flight risk because he had entered the United States illegally utilizing fraudulent documents.[10] (2 RR 6-7). Nevertheless, even with Appellee's contemporaneous criminal cases kept out of the analysis, Appellee fails to show an acute prejudice beyond the stresses normally associated with being prosecuted for murder—especially in light of the fact that the length of delay was minimally (if at all) sufficient to trigger *Barker*.

Combining the *Barker* factors together, Appellee's right to a speedy trial was not violated. And because it was not violated, had there been no prosecutorial vindictiveness, the case would not have necessitated a dismissal with prejudice on speedy trial grounds. Thus, the trial court abused its discretion in dismissing the case with prejudice without the State's consent after finding the State had been unconstitutionally vindictive in retaliation for Appellee's speedy trial motion. The trial court's authority to "neutralize the taint" only extended to dismissing the capital-murder charge but leaving the door open for the State to reindict Appellee for murder based on the facts of the case before it.[11] Dismissing the case

---

[10] We question whether the State's representations regarding Appellee's pending cases in Mexico and his allegedly illegal entry based on fake documents into the United States constitute competent evidence. We will assume it is for the sake of argument.

[11] We do not foreclose the possibility of dismissal with prejudice as an appropriate remedy in other circumstances. We merely hold that it was not necessary to neutralize the taint in this case.

with prejudice, however, went well past returning the case to its original state and punitively invaded the exclusive province of the State's prosecutorial discretion. And in doing so, the trial court exceeded both its enumerated and inherent authority.

### *Potential Remedies*

Having found dismissal with prejudice too drastic, we now explore whether the additional remedial condition of forced recusal (over any State objection) is required to neutralize the taint under the facts of this case. Although there are variety of reasons and avenues to remove or recuse a district attorney, we note the Appellant has not requested that at any time. On remand, Appellant would not be foreclosed from seeking that as a remedy, but there is nothing in the record to suggest that is a remedy they desire.

"Relying on Tex. Const. Article V, Section 21, Texas courts have uniformly declared that the offices of county and district attorneys are constitutionally created and therefore constitutionally protected. The authority of county and district attorneys cannot be abridged or taken away." *State ex rel. Eidson v. Edwards*, 793 S.W.2d 1, 4 (Tex. Crim. App. 1990) (internal citations and quotes omitted). Our statutes further mandate that "[e]ach district attorney *shall* represent the state in all criminal cases in the district courts of the attorney's district . . . ." Tex. Code Crim. Proc. art. 2A.102 (formerly Article 2.01 (emphasis added)). And unless some explicit authority requires otherwise, we have long held that "[t]he responsibility for making the decision to recuse himself is on the district attorney himself; the trial court cannot require his recusal." *Coleman v. State*, 246 S.W.3d

76, 81 (Tex. Crim. App. 2008) (citing *Johnson v. State*, 169 S.W.3d 223, 229 (Tex. Crim. App. 2005); *State ex rel. Hill v. Pirtle*, 887 S.W.2d 921, 939 (Tex. Crim. App. 1991)).

The Legislature has given us several statutory avenues that permits us to interfere with the authority of the district attorney. Of these statutes, none apply to the circumstances of this case. Chapter 87 of the Local Government Code allows for the complete removal of a district attorney from office for incompetency, official misconduct, or intoxication. Local Gov't Code § 87.013 However, such a removal can only be done by filing a petition for removal followed by conducting a full jury trial. Local Gov't Code §§ 87.015, 87.018.

The Code of Criminal Procedure requires recusal in specified scenarios where the prosecutor is disqualified. Tex. Code Crim. Proc. art. 2A.105 (formerly Article 2.08). However, the record here does not reflect that the current District Attorney for the 34th Judicial District or any member of his office is or would be disqualified. No party has even suggested that the District Attorney is disqualified, nor implicated any conflicts of interest. *See* Tex. R. Prof. Conduct 1.09 (prohibiting an attorney from representing another person "in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client"); *Landers v. State*, 256 S.W.3d 295, 305-07 (Tex. Crim. App. 2008) (utilizing Tex. R. Prof. Conduct 1.09 as "guidance" in interpreting Tex. Code Crim. Proc. art. 2.08 (now Article 2A.105)). We reiterate that no party has requested the recusal of the District Attorney and is not precluded from doing so on remand.

Secondly and from a more pragmatic perspective, just like we cannot take a case away from a prosecuting authority, we also lack the authority to force a neighboring

prosecuting authority to take the case. We cannot require a neighboring authority to travel to another jurisdiction to prosecute a case against their consent. There is no incentive for a neighboring nor any other district attorney to do so. They receive no additional compensation nor even travel costs for taking the case. Especially in this case, the nearest neighboring prosecuting authority to the District Attorney's Office for the 34th Judicial District is a considerable distance away. This presents additional logistical challenges compared to other areas in Texas where the geographical distance between neighboring county seats is far shorter. Moreover, most of these are small offices. It is dangerous to set a precedent that cannot be applied evenly throughout the state.

Finally, the nearest neighboring district attorney's office may not be in a position or be otherwise equipped to take on such a complex case. Some offices have only a handful of part-time attorneys and have little-to-no experience dealing with a potential capital-murder case. Other offices may have their own challenges such as overwhelming caseloads or shortages of either human or equipment resources.

In summary, dismissal without prejudice without forced recusal is the sure-footed path forward here. Indeed, the past problematic district attorney was recently defeated and replaced with a newly elected district who may very well be acceptable to Appellee. In accordance with Supreme Court case law, the scope of this remedy is narrowly tailored to cure the harmful conduct in this case without "unnecessarily infringing on competing interest." *United States v. Morrison*, 449 U.S. 361, 364, 365 (1981).

**CONCLUSION**

It is undisputed that prosecutors for the State have immense discretion in deciding whom to criminally charge and what criminal charges to pursue. Still, utilizing the death penalty—the ultimate punitive measure—in retaliation for the valid exercise of a constitutional right is incongruent with the prosecutor's compelling "obligation to govern impartially" and duty as a servant of the law to refrain from striking "foul blows." *Berger v. United States*, 295 U.S. 78, 88 (1935). Thus, the circumstances that led to this case are concerning. And partly because of the State's mishandling of this case and other cases from this time period, we note that multiple administrations have come and gone at the Office of the District Attorney for the 34th Judicial District.[12] We remain optimistic that the current administration will not continue such folly.

Nonetheless, we hold that the trial court exceeded its authority in dismissing Appellee's capital murder charge with prejudice. Doing so abused the trial court's power to neutralize the taint of prosecutorial vindictiveness. Consequently, we reverse the court of appeals and modify the trial court's dismissal to be without prejudice. In doing so, we grant the State's request to allow a reindictment of Appellant for the original charge of murder or any other lesser-included offense per its discretion.

---

[12] The District Attorney for the 34th Judicial District serves not only the entirety of El Paso County, but also acts as the district attorney for Culberson and Hudspeth counties as well.

Filed: September 3, 2025

Publish